Case number 19-6447, Buck Ryan versus David Blackwell et al. Oral argument is not to exceed 15 minutes per side. Mr. Abel for the appellant. May it please the court, your honors, my name is Robert Abel and I represent the appellant Buck Ryan in this case. Mr. Ryan is a faculty member now for about 25 years and significant to our case. He's a faculty member for nearly about the same time. He works in the journalism school. He's been much honored both within the university and otherwise in his profession. And the genesis of that, there's two claims that are before the court today. Both are in the nature of retaliation claims and they arise, the genesis of the case is an audit report regarding Professor Ryan's use of a self-authored text in classes that he taught well over the course going back I believe to about 2008. And anyway, an audit was performed and a determination was made that he had violated university policy. The demand was made to him by a supervisor who was then the dean of the college that he resigned. And of course as a he had a property interest in accordance with the supreme court decision and board of regents versus broth from the early 70s and continued employment in that case. And he refused the demand that he resigned and subsequent to that formal administrative proceedings toward his termination were inaugurated a few weeks later in March of, excuse me, in May of 2018. Is another way to describe those ensuing proceedings due process? Yes, it is. They were consistent with the due process requirements that attach and arise from his property interest, your honor. So his refusal to resign, which I guess was maybe invoking his due process right, you might say, was met with due process? It was met with due process, but the basis for his retaliation claim as to that and the mistake that was made by the district court, your honor, was a statement made by David Blackwell, provost of the university, in a press release issued and published in the local newspaper, the Lexington Herald-Leader that accused Professor Ryan not just of violating university policy but of having stolen from students, of being a thief, is an accusation that inflicts a reputational injury. But didn't that set up the parameters for the due process here? What was said is what they discussed in due process, right? Well, what was, I think you're referring, your honor, the step in the administrative process was the matter got referred to an entity known as the Senate Committee on Privilege and Tenure that determined that there had not been a violation of university policy and recommended the termination proceedings be ended. And they still remain pending as we speak some 20, almost 26 months later. I'm sorry, I hate to interrupt, but so the faculty committee, I understand, recommended that he not be terminated and I was wondering what, did he actually get terminated and how did that happen? But you're saying no, he hasn't actually been terminated? He has not been terminated. The basis of our, the basis of retaliation, your honor, is the accusation that he had stolen from students, an accusation that inflicted a reputational injury. And the court's precedents, and I've cited a case called Bogg v. Ryber, which is a 1998 case that collected cases, said a form it holds, a form of actionable retaliation is something that inflicts reputational injury. An accusation by university provost at, from the university at which you're that you have stolen from students does inflict reputational injury. You know, I follow what you say, maybe it's a defamation case, but I'm trying to figure out why your client didn't receive due process. I'm not making myself clear. The claim isn't that he didn't receive due process, the claim is, as Judge Riedler observed, in refusing to resign, he asserted his due process rights, and in retaliation for that, a reputational injury was inflicted. That reputational injury being an accusation that he had stolen from students. That was, that was the basis, that was the basis for the due process, and that was the basis for the disciplinary action against him. I mean, they were going to have proceedings regarding whether he should be terminated, lose his tenure rights, and that was all about whether he stole from the university or from students. So this was like the gist of the dispute. In other words, you're, are you saying that every time a university would allege a professor has done something wrong, that that itself is retaliation? Because that's, that's always the gist of the proceeding. No, I would not say always, although it could be in some instances where there's proof that there was no for the accusation, but your honor, it's one thing to basis for the accusation until you have the hearing, right? So, so what if a professor were accused of something terrible, like sexual assault, and gets placed on some kind of administrative leave, and then, you know, there's an upcry because he's a very popular professor, and the university president says, well, professor so-and-so has been accused by a student of sexual assault, and then there's a university proceeding to figure that out. Is the, is the university president's statement a fact that there's been an accusation? Retaliation? Is that? Well, if you, if you assume that it's a fact that it in fact occurred, that would be a different thing. I would like for y'all to draw. I'm sorry, so, so the, the gist of your claim is that he didn't say professor Ryan has been accused of, he said professor Ryan did do this. Yes, that's the distinction. Yes, yes, and I would like the court to draw a distinction between a termination that's based on a violation of university policy, as, as opposed to a violation of university policy, and, as in this case, by the way, this individual stole from students. During the due process, I'm sorry, what I understand is during the due process hearing, the dean or the investigator, someone is going to testify that the professor stole from the students, so that claim is going to be made in the hearing. They're not going to say he's accused of it, they're going to say here's the evidence that he actually stole, and you're saying there's a distinction between, I guess, saying it to the media versus saying it during the proceeding, which the proceeding might be public. I'm not, I'm not sure. Well, I, I don't know what proceeding is going to ensue. I know that professor Ryan did not steal from any students. The faculty proceeding, was that a public proceeding? Did people appear at that? Was there evidence presented about whether he did or didn't steal? The, the tenure, privilege and tenure committee did an investigation. I think they interviewed some people. I did not, we did not have a type of quasi-judicial proceeding or something like that, and they issued a report that's attached as one of the exhibits to the complaint, but it was not, it was not in the nature of a hearing, as I think you're aware, Judge Riedler. So, our claim, as you, as you observe, Judge Riedler, that an assertion of a constitutional right to due process was made, an exercise of that right, and in retaliation, a false accusation that he had stolen from students was made. That is actionable retaliation, because that type of accusation inflicts a reputational injury, and those, that's the essence of what I'm characterizing as a due process retaliation claim. I'm not, I'm not claiming that the process was deficient. I'm claiming that an injury, a reputational actionable injury was inflicted by the statement that he had stolen from students, which is not true. I guess I could see it as sticking in between. Go ahead, go ahead, Judge Reinrich. I was going to say, anytime you have a due process hearing, it seems to me there's an issue that goes to your credibility, or your honesty, or something. Right? Otherwise, there's no need for a hearing. Well, the due process hearing, in this case, can resolve whether or not university policy was violated by Professor Ryan, a relatively benign finding, but it cannot cure the reputational injury that, I mean, even a simple Google search for Buck Ryan turns up this newspaper article in relatively short order, perhaps even on the first page. That's the injury that we're seeking to cure in this lawsuit. Can I ask you about the First Amendment retaliation claim? Please. So, in one sense, you have an internal employment dispute here, but then the subject of the internal dispute goes out and talks about it publicly, and that transforms it, then, into a matter of public concern for which it's protected? Well, the court has held that personnel matters of this, and I've relied principally on Bunnell versus Lorenzo, that speaks to alleged misconduct by faculty members that impact students, which is what was going on in Bunnell, raises matters of public concern. The university, I guess, recognized it because they issued a press release that is part of the publication in the newspaper. Subsequent to that, as pleaded in the complaint, there was quite a reaction from Professor Ryan's colleagues on the faculty protesting this action and whatnot. Subsequent to that, at a public forum, a faculty forum with the provost and the university president there, Professor Ryan protested this abuse of power and mismanagement that had been directed at him to, at a minimum, taint and stain his life. I guess what I was getting at is it seems like there's, again, an internal employment dispute, and the reason it becomes a matter of public concern is mostly because the subject of the dispute starts speaking publicly about it. Maybe I'm wrong about that, but that seems like an odd way to transform a matter that's private to a matter that's public that then protects the employee's speech. Well, I see I'm out of time, but can I The media coverage was initiated by the university. They are the ones that issued the press release that made the accusation that Professor Ryan had stolen from students, so this was thrust in the public eye by the employer, not by Professor Ryan, but thank you. Thank you. We'll hear from Mr. Bowman. Good morning, Your Honors. May it please the at least engaging in this process, even though we all can't be present together in Cincinnati. The dismissal and the judgment below should be affirmed for three different reasons. First, the complaint does not plausibly allege that Professor Ryan engaged in any constitutionally protected conduct. Second, the complaint also doesn't plausibly allege any actionable retaliation that occurred to Professor Ryan, and three, overarching both of those, the complaint fails to plausibly plead any causal link between the two. If I could correct one characterization that's been made, I think of the facts and of the record. There's reference made to a press release. That is not the case. Exhibit K to our motion to dismiss is the email from the university public relations officer responding to inquiries and questions posed by the Herald-Later reporter. This was not a release or a press conference or something that the university. Oh, it's statements made by the university. It is. Why did they have to make those statements? Why did they have to just say no comment? This is an internal matter that we're not going to comment on. Well, they have a constitutional right to respond, and certainly the provost has the right to speak on that. As you referred to earlier, that is what was going on. That is ultimately what was going to happen, whether it would be filing, certainly the audit once it was completed of the conduct that occurred here as a public record. Anyone could have obtained a copy of that by submitting an open records request. Those factual details were in there. Of course, what it showed was that Professor Ryan had the university pay for the printing of a book that he required his students to have instead of giving them the book for free since the university had already paid for it, which is, by the way, what his department chair thought was going to happen. He sold it to local bookstores and then required his students to go get it. The audit report is attached as Exhibit A in our motion to dismiss and should be there. I appreciate that clarification because I didn't quite understand that fact from the record. We all went to law school. We're pretty familiar with law professors instructing reading assignments or book purchases that sometimes are the author. The difference here is that it was paid for by the university as opposed to a private publishing company? This happened multiple times through the years. The university has an in-house print shop that the university can do, and then that gets charged back to the department. The university has a process. There's really two aspects of that process I think that are important. First, the university can pay for its own printing. Of course, when it does, it does so with the expectation that you wouldn't double dip and then charge the students for that. The university also has a policy to address the experience we've all had of when a professor assigns their own textbook. That is not prohibited per se. It does, however, require those professors to make a donation back of any profits so that they aren't engaging in any self-dealing. What happened here in the most recent example, there's some prior ones through the years, but in the most recent example, it's kind of like a workbook. It's not like a hardbound textbook. It's a workbook that you can have pages that you rip out and fill in so it's not reusable or students can sell them back. That's what the university paid for in-house. He then took it and sold to a couple of the local bookstores. Could you make an argument, counsel, that the fact that the dean said he stole from students publicly makes this a matter of public concern? Well, your honor, it was the provost who said that. It was Provost Dave Blackwell who's been named here. It doesn't make it a matter of public concern for a couple reasons. I think first, you know, if you had an employee who uncovered missing funds and brought that to light, brought that to the attention of the provost or the university treasurer, the board, whoever it may be, you know, complaining about missing money likely is protected speech from a public institution. But when you're the one who's accused of the nefarious dealings that resulted in the missing money, you know, an employee being caught and disciplined because of the missing money, that's not protected speech. And as this court has said back in the late 80s in Barnes v. McDowell, you know, the mere fact that monies are related, public monies and public fisc is related to the employee's speech doesn't automatically turn it into a matter of public concern. This case is different. This case is the quintessential employee beef that this court first noted in Murray back in the mid-80s, and it's been repeated time and time again for that. Judge Rehler, you made a point earlier that the comment was the gist of what the complaint was going to be about toward Professor Ryan in order to revoke his tenure and terminate his employment. And I think that's critical to note because that addresses the Block case. Block case has some horrific facts. You have a rape victim who's gone to law enforcement, and over the course of 18 months, there's little to no development in that investigation into that crime. And she speaks to the local newspaper, to the Cleveland Plain Dealer, and she's complaining about the sheriff, and the sheriff reacts by calling a press conference and revealing some of the most intimate details of that rape in a very embarrassing fashion. But what's different about Block that we don't have in this case? And this is a very friendly opinion. The plaintiffs in Block, the rape victim in Block, specifically pled that the sheriff's so-called retaliatory speech had no relationship with the prosecutor. And Judge Rehler, that goes to the heart of your question, that the gist of the provost's speech was about the very heart and nature of what the disciplinary proceedings were. So I think Block, frankly, supports our position in this case. Just to follow up on Judge Larson's question, are the proceedings over? No, the proceedings aren't over. And I will address, so the university's tenure revocation proceedings are quite detailed. They're also available online. The link is in our brief. They're in footnote 22. But the way the proceedings work is step one, which is what had occurred actually before the provost made the comment. Step one requires university administrators to sit down with the tenure professor and see if they can work it out. Now, in this situation, there wasn't a lot to negotiate, so to speak. But step one is have a conference, have a meeting, engage in an interactive process, which the university has a duty to do under certain measures. They did that. That didn't work. They did that. So then it went to the faculty senate. Well, actually, the second step is the provost then initiates charges. The third step is that's referred to a special committee of the university senate who does their investigation. They did that over the course of the summer of 18. And on August 6 is when they made their report. And their report did not exonerate Professor Ryan. They specifically said he needs to wasn't enough to justify tenure. And that's their opinion. That opinion then goes to the president as an advisory opinion. The president then makes a decision whether to move forward. He then initiates more charges. It would then go back to the university faculty for a different hearing panel. Basically, my question was, where are we in that procedure, or is it done? Right. It is not done. When the university committee sent it back, and I would say that the due process here had been working, right? The university faculty committee sent it back. The president had more questions, asked Mr. Reed, who's the auditor, to have a different conversation with Professor Ryan. In fact, there's an email from the president to Professor Ryan laying out some of those topics. That discussion takes, as all this did, it takes a couple months. I think Professor Ryan responds in February of that. And then in April, this suit is filed. So as things stand right now, no, it has not been resolved. But that's not really relevant to the point in time in April when the suit was filed and what the complaint alleges, whether it asserts a due process retaliation, whether it asserts a First Amendment, whether it's even protected speech, or whether it's retaliatory. You know, there's a complaint about the provost's comment. Well, that predates Professor Ryan's speech by months. And again, that's part of the problem with this complaint. You know, Connick teaches us that we have to look to determine whether something's protected speech. We have to look at its content, at its form, and at its context. And this complaint gives almost no guidance as to either of those three. What does the complaint allege that Professor Ryan said? When did he say it? Where did he say it? At best, there's two paragraphs in the complaint, paragraphs 44 and 45, which are at page nine of the record, which make two allegations. One, he spoke in a public forum, which is of the proceedings to terminate his tenure in employment. Again, he's complaining about his own discipline that is coming. That doesn't convert this to a matter of public concern. These bare-bones pleadings, I would say, does one of two things. It's either not enough to establish a plausible claim, or it's just enough to plead himself out of protected speech when he says, I spoke about the proceedings to fire me, and I didn't think there was grounds for it. That is a quintessential employee beef. But in the midst of all that, I think the worst position I would argue today, or the better argument, perhaps, is the way to say it, is none of this is clearly established law. When you look at the plethora of cases that we have on what constitutes protected speech, there is no clearly established law from either the Supreme Court or this circuit that says the provost responding about the very gist of the charges against a tenured professor is prohibited, nor would that be considered retaliatory conduct. Provost Blackway would have had no idea from the rulings of the Supreme Court or the Sixth Circuit, to refer back to your earlier question, Judge Reeder, that he's supposed to say, no comment, under no circumstances, cannot make any comment. You must simply look at our pleading. No law and no guidance from this court that has said that. Second, the other allegation of retaliation is that the university's auditor, at the direction of the president, kept asking questions. So think about this process, how it's designed. The university faculty committee issues a lengthy report and says, look, we don't think it meets it and these are other issues. And the president takes that report and perhaps says, good point, let's look a little further. That can't possibly be retaliatory when you're following the process that Professor Ryan is entitled to under the university policy. And third, there's the allegation that for the spring semester in 2019, he was removed from any teaching assignments. Well, that's not retaliatory conduct, but this court, on at least three different occasions in the Fifth Circuit, quite clearly has said that there's no constitutional right to teach or constitutional right to teach certain classes or at certain times. And in the qualified immunity would protect all of the actors here. With that, your honors, one procedural note to point out. Sadly, Professor Farrell has passed away during these proceedings. And so although we've talked about him, that estate has not been substituted. And I just didn't want the court to not know about that. And Mr. Abel clearly knows about that. We've had those disclosures, but I just want to make sure the court is aware of that. Thank you all for your time this morning. All right. Thank you, Mr. Abel. I don't think you reserved any rebuttal time. Am I right about that? Three minutes, Your Honor. Oh, you did? Okay. Yes. Sorry. I don't do them. Well, let me speak. I think there's three things I want to talk about is one. We had a factual argument, uh, regarding whether or not the university paid for or absorbed the cost of the publications in question. We're on a rule 12 motion. I mean, this comes up to the court from a rule 12 dismissal. The facts, of course, are supposed to be construed in Professor Ryan's favor. It is our claim, and the proof will show that the university did not absorb the cost for these books. But we're not at that stage yet, and that's not in the record. Um, second, with regard to public concern, I really call the court's attention to Bunnell versus Lorenzo. It's kind of an unusual case. But but this court's holding there was to the to the the professor was accused of sexual harassment, posted the complaint on some bulleted boards around the school issued a kind of a treatise to the local media, and the court held that he was speaking to a matter of public concern, but because it involved the university's policies, their sexual harassment here, use of textbooks, and it intersected with the welfare of students. You know, they're being subjected to sexual harassment here with regard to the use of the textbooks, and the court also noted that the employers resort to the media in that case. As far as clearly established goes, in 1972, Board of Regents versus Roth established the property interest that's held by Professor Ryan. Block versus Reiber in 1998 collected a lot of cases for the point that actionable retaliation occurs where reputational injury is inflicted, which it has been here. And, of course, as to the First Amendment, we're talking form, content, and context, and a Rule 12 motion. It's I don't think the complaint is 15 pages long, 80 something paragraphs, there's four exhibits hardly characterized as a bare bones pleading. It's been sufficiently and plausibly alleged just because you're the victim of abuse and misuse of public power doesn't strip you of your First Amendment right to protest it. But with that said, thank you all for convening this. It's very unusual to do this. I guess it's something we're all going to have to get used to at least for a while, but I'll rest on my remarks in the briefs and wish everyone well. Thank you. Thank you to both of our fine counsel today. Your arguments were helpful. We appreciate your appearing under these unusual circumstances. We hope it won't be forever. So with that, the case is submitted and the clerk may adjourn court. Thank you. This honorable court is now adjourned.